UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
NATAKI WILLIAMS,

Plaintiff,

-against-

VIACOM INTERNATIONAL MEDIA NETWORKS INC.,

Defendants.
-----------------------------------------------------------------X

16 Civ 00029

COMPLAINT
and JURY DEMAND

The Plaintiff, Nataki Williams ("Plaintiff" or "Williams"), by and through undersigned counsel, and by way of this complaint against Viacom International Media Networks Inc. ("Viacom"), alleges as follows:

<u>SUMMARY OF ACTION</u>

1.       This action stems from the unlawful and retaliatory firing of Nataki Williams, a Vice President for Financial Planning and Analysis at Viacom, after she voiced her opposition to what she reasonably believed to be an illegal tax avoidance scheme in violation of federal law put forth by her superiors at Viacom.  Ms. Williams, who worked at Viacom for seven years, received excellent performance reviews and two Viacom "Presidential Awards," was terminated for making protected disclosures under Section 806 of the Sarbanes-Oxley Act of 2002 ("SOX") as partially amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank").  She now seeks the appropriate relief under Section 806 of SOX as codified by 18 U.S.C.A. § 1514(a), and under Section 922 of Dodd-Frank, as codified in 15 U.S.C § 78u-6(h).

JURISDICTION AND VENUE

2.     The Court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331, as this complaint is based on the violation of federal statutes (18 U.S.C.A. § 1514(a) and 15 U.S.C § 78u-6(h)).

3.     Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. § 1391(b), because the incidents complained of occurred within this district.

PARTIES

4.     The Plaintiff, Nataki Williams, is a United States citizen who resides in Irvington, New Jersey.

5.     Ms. Williams was an employee of Defendant Viacom from November 26, 2007 until she was fired on April 9, 2014.

6.     Defendant Viacom is a publicly-traded corporation organized under the laws of Delaware, with its principle place of business at 1515 Broadway, New York, NY 10036.

7.     Defendant Viacom was Ms. Williams's "employer" within the meaning of SOX, Dodd-Frank and all other applicable laws.

8.     Defendants are regulated by, and subject to, all or a portion of the SOX and Dodd-Frank acts.

FACTUAL ALLEGATIONS

9.     Ms. Williams began working at Viacom on November 2007 as a finance manager. She was quickly promoted to Finance Director in August 2008.  In February 2010, she was promoted to the position of Vice President for Financial Planning and Analysis.

10.     Until she was terminated, Ms. Williams's job performance was excellent.  In seven years, she was promoted twice, her reviews consistently exceeded expectations, and she received two Viacom "Presidential Awards."  She had every reason to expect a long and fruitful career at Viacom.

11.     As Vice President for Financial Planning and Analysis, Ms. Williams was in charge of consumer products and international program sales.  In short, her responsibilities included: engaging in contract negotiations, assembling budgets for various ventures, and supervising 23 employees.

12.     In 2009, Viacom acquired the international licensing rights to Teenage Mutant Ninja Turtles ("TMNT") from The Mirage Group and 4Kids Entertainment.

13.     In April of 2010, shortly after Ms. Williams was promoted to Vice President, she learned that Viacom was hatching a plan to attribute TMNT's revenue to the Netherlands for tax purposes.

14.     TMNT was owned by an entity in the Netherlands, but all of the business concerning those rights took place in New York.  New York personnel made the licensing decisions, and the licensing contracts were negotiated by attorneys in New York and were subject to New York law.

15.     The sole purpose of transferring the licensing rights to the Netherlands company was to avoid the US tax burden.  Ms. Williams reasonably believed that the act of attributing the income from the licensing of TMNT to the overseas entity was inconsistent with U.S. tax law. She further believed that this scheme constituted a violation of federal law and, if discovered by authorities, would negatively affect Viacom and its shareholders.

16.     Her belief in the illegality of this scheme was further solidified after Ms. Williams learned that in order to make the business transactions look legitimately like they were being conducted from the Netherlands, Viacom schemed to have a Netherlands-based employee, Linda Kirby, make unimportant changes to draft contracts and sign off on contracts.  In reality, all of the negotiating and legal work conducted around these contracts was happening in New York.

17.     Additionally, Ms. Williams heard her superiors joke about "not looking good in orange," referring to prison garb.

18.     At a meeting with her colleagues and superiors, Ms. Williams spoke out against the plan.

19.     Several other Viacom employees spoke out against this plan on the basis that it was illegal.  One such employee, Shen-Hsin Hung, a Senior Vice President, was fired after she expressed opposition to the TMNT tax avoidance scheme.

20.     After Ms. Hung was fired, Ms. Williams and others were notified that there was legal action in connection with her firing, and were advised to preserve certain emails.  The fact that Ms. Hung was fired for speaking out against such a plan further cemented Ms. Williams's belief that the tax scheme was illegal.

21.     The plan was quickly shelved in the summer of 2010, at a time when TMNT revenue was relatively low.  Upon information and belief, during the summer of 2010, Viacom assigned the TMNT rights back to the United States via a transfer price agreement, thus paying United States taxes on what relatively small amount of revenue that TMNT generated prior to the launch of the TMNT film in 2014.

22.     In January of 2013, Ms. Williams learned that Viacom was reintroducing the Netherlands transfer plan to avoid paying taxes.  Not only did Viacom want to do this for

TMNT, Ms. Williams learned that Viacom was seeking to expand this tax avoidance scheme, which she reasonably believed to be illegal, to include other properties that Viacom ran out of New York.

23.     Specifically, she learned that Viacom also intended to have the nominal entity in the Netherlands purchase the rights to the popular children's characters Dora the Explorer ("Dora") and SpongeBob SquarePants ("SpongeBob").

24.     She further learned that Viacom intended to expand this scheme beyond TMNT, Dora and SpongeBob to include other properties owned by Viacom.  She heard her superiors say that it would save Viacom millions of dollars.

25.     Ms. Williams continued to believe that this proposed tax scheme was illegal, and she had an obligation to report her concerns to her superiors.  Additionally, the revelation that Viacom was pursuing an illegal tax avoidance scheme would undoubtedly affect the company's shareholders.

26.     In January of 2013, Ms. Williams expressed her legal objections to this plan to her superiors.

27.     In the summer of 2013, Hans DeGroat, Viacom's Special Vice President of International Tax, verbally instructed the finance employees, including Ms. Williams, to not put the details of any of these tax avoidance plans in an email.  This further supported Ms. Williams's belief that the tax scheme was illegal and fraudulent.

28.     Concerned that the proposed tax restructuring was unlawful, Ms. Williams emailed Jay Kushner, head of Viacom's Global Tax Department, on September 11, 2013, with a list of reasons not to proceed with the transfer.

29.     Later that month, Paul Rourke, Ms. Williams's direct supervisor, informed her that the Viacom Chief Financial Officer had already made up his mind about the plan, and that she should no longer oppose the scheme.  The implication of this response was clear to Ms. Williams: keep quiet about the tax dodge or expect trouble.

30.     Ms. Williams continued to voice her objections.  On October 29, 2013, she was on a conference call with her superiors, including Paul Rourke, Hans DeGroot, Lisa Silverman-Myers, Jay Kushner and others.  On that call, she stated that she had spoken with Linda Kirby, Viacom's Netherlands-based employee who would be signing and purporting to be amended the contracts to make it appear that they were being handled abroad.  She reported that Ms. Kirby stated that she could not credibly claim to be negotiating these contracts.  Her objections were ignored by her superiors.

31.     However, as part of her duties as Vice President for Financial Planning and Analysis, Ms. Williams had to plan the operational details of the restructuring, which obligated her to take part in a process she believed to be unlawful.

32.     Ms. Williams was scheduled to be on maternity leave from January 15, 2014 until May 1, 2014.  On April 9, 2014, exactly twelve weeks after her leave began, she was fired.

33.     The reason given for her termination was that she had listed her partner, and father of her child, as her spouse on Viacom's benefits paperwork.  However, Ms. Williams never misrepresented her marital status at any time.  Her W-2 status was always listed as single, and she never represented to anyone, formally or informally, that she and her partner (who, coincidentally, also has the last name Williams) were married.

34.     In fact, it was Ms. Williams who noticed in January of 2013 that her partner had been incorrectly listed as her spouse, apparently as the result of an internal change in Viacom's benefits system.

35.     Ms. Williams immediately called the benefits hotline and explained the error, only to be told that nothing could be done until the open enrollment period commenced in November of 2013. At that time, Ms. Williams again contacted the benefits department to correct her partner's status (which in the end was of no consequence, as unmarried and married partners are treated equally under the plan in effect at the time).

36.     She heard nothing more about this issue until the day she was fired. This alleged reason for her termination was pretextual.

37.     Ms. Williams was actually fired in retaliation for her internal whistleblowing of an unlawful tax avoidance scheme that would have saved Viacom millions, and that Ms. Williams reasonably believed was fraudulent. This retaliation was in violation of both SOX and Dodd-Frank.

38.     On October 3, 2014, Ms. Williams filed a complaint with the United States Department of Labor ("DOL"), Occupational Safety and Health Administration ("OSHA") as required by 18 U.S.C § 1514(A)(b)(1)(A).

39.     More than 180 days has passed since the filing of this complaint with the DOL, thereby giving this Court jurisdiction under U.S.C § 1514(A)(b)(1)(B).

40.     As a result of this retaliatory firing, Ms. Williams has suffered, and continues to suffer, loss of her career, damage to her reputation, loss of income and future income, and emotional distress and other non-pecuniary losses.

## **FIRST CAUSE OF ACTION**

41.    Plaintiff repeats and re-alleges each and every allegation contained in paragraphs

one through 41 of this Complaint with the same force and effect as if fully set forth herein.

42.    Defendant Viacom violated 15 U.S.C § 78u-6(h)(1) because its decision to

terminate Ms. Williams's employment was motivated by her making disclosures that are

protected by Section 806 of the Sarbanes-Oxley Act as codified at U.S.C § 1514(A).

43.    Defendant Viacom is covered by SOX because, upon information and belief, it

"has a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15

U.S.C. 78l)" and it is "required to file reports under section 15(d) of the Securities Exchange Act

of 1934 (15 U.S.C. 781(d))".  U.S.C § 1514(A)(a).

44.    Ms. Williams engaged in activity that is protected by Section 806 of SOX as

codified in U.S.C § 1514(A) when she informed her superiors about conduct she reasonably

believed violated "provision[s] of Federal law relating to fraud against shareholders," including,

but not limited to, a potentially fraudulent tax avoidance scheme.  U.S.C § 1514(A)(a)(1)(c)

45.    Ms. Williams was then fired by Defendant Viacom after she voiced her objections

to the scheme to her supervisors.  Defendant has violated 15 U.S.C. § 78u-6(h)(1)(A) by firing

Ms. Williams for engaging in this protected activity.


## **JURY DEMAND**

46.    The Plaintiff respectfully demands that this proceeding be tried by a jury pursuant

to U.S.C § 1514(A)(b)(2)(E).


WHEREFORE, Plaintiff prays for the following relief:

1)      Reinstating Ms. Williams to her position at Viacom that she would have maintained but for the unlawful retaliation; and

2)      Awarding Ms. Williams the amount of back pay she is owed, with interest;

3)      Should Ms. Williams not be reinstated, also awarding her front pay;

4)      Awarding attorney's fees and costs;

5)      Granting such other relief as is just and proper.


DATED:      New York, New York
            January 5, 2016




                        Respectfully submitted,

                        BERANBAUM MENKEN LLP



                        _____
                        By: Jason Rozger
                        Scott Simpson
                        80 Pine Street, 33rd Floor
                        New York, New York 10005
                        (212) 509-1616
                        (212) 509-8088
                        jrozger@nyemployeelaw.com